UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TACTICA INTERNATIONAL, INC., JOSEPH E. MYERS of CLEAR THINKING GROUP LLC, as creditor trustee for THE TACTICA CREDITOR TRUST, and IGIA, INC. <br><br> Plaintiffs, <br><br> v. <br><br> JENKENS & GILCHRIST, <br><br> Defendant. | JURY TRIAL DEMANDED <br><br> CIVIL ACTION NO. 07-cv-5472 (JGK) <br> ECF CASE |

## CIVIL ACTION COMPLAINT

Plaintiff, by its attorney, Richard M. Mortner, Esq., alleges for its complaint as follows:

### I.    JURISDICTION AND VENUE

1. This Court has subject jurisdiction of this action under 28 U.S.C. §1332, because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and because the controversy is between citizens of a state and citizens of a foreign state.

2. Personal jurisdiction over the defendant also is proper based on New York Civil Practice Law and Rules § 302, and Rule 4 (h) of the Federal Rules of Civil Procedure.

3. Personal jurisdiction and venue in this action are predicated on 18 U.S.C. § 1965 and on 28 U.S.C. § 1391(b), since Defendant transact their affairs in the Southern District of New York, and certain activities of the Defendant giving rise to this action took place in the Southern District of New York.

## NATURE OF THE ACTION

4. Plaintiffs alleges that their attorneys, Henry Rothman, and his firm Defendant Jenkens & Gilchrist, committed legal malpractice and breached their contract with Plaintiffs at the time that Plaintiffs entered into a "reverse merger" transaction.

## THE PARTIES

5. Plaintiff Tactica International, Inc. ("Tactica") is a privately held Nevada corporation in the business of selling and distributing personal care products, is presently in Chapter 11 bankruptcy. Tactica maintains an office at 16 East 40th Street, New York, NY 10016.

6. On October 21, 2004 (the "Petition Date"), Tactica International, Inc., filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtor operated its business and managed its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. On January 6, 2006, Tactica filed its revised First Amended Plan of Reorganization (the "Plan"). By order dated January 12, 2006, the United States Bankruptcy Court for the Southern District of New York confirmed the Plan.

8. The Plan provided for the establishment of a Creditor Trust (the "Tactica Creditor Trust") and the appointment of the Creditor Trustee to administer the Trust Assets (as such terms are defined in the Plan).

9. Plaintiff Joseph E. Myers of Clear Thinking Group LLC was appointed as and appears herein as the Creditor Trustee for the Tactica Creditor Trust.

10.     Plaintiff IGIA, Inc. (formerly known as Diva Entertainment, Inc.), is a publicly-held Delaware corporation with its principal executive offices at 16 East 40th Street, 12th Floor, New York, NY 10016.  Avi Sivan is the current Chief Executive Officer of IGIA.

11.     Upon information and belief, defendant Jenkens & Gilchrist ("J&G") is a professional corporation organized and existing under the laws of the State of Texas for the purpose of practicing law.  Defendant J&G has a principal office located at 500 North Akard, Suite 200, Dallas, TX 75201.

12.     Upon information and belief, Henry Rothman ("Rothman") is an attorney licensed to practice law in the State of New York.  At all times relevant herein, defendant Rothman practiced law as a shareholder or partner of defendant J&G.  Rothman is not a party to this action.

**Preliminary Statement**

13.     This lawsuit arises out the defendant's negligent representation of Plaintiffs in a "reverse merger" transaction (the "Transaction"), under which Tactica International, Inc. ("Tactica") acquired a majority interest in Diva Entertainment, Inc. ("Diva"), a so-called public shell corporation in June 2004.  After the reverse merger was completed, Diva changed its name to IGIA and Tactica became a wholly owned subsidiary and an entity through which IGIA conducts its operations.

14.     Rothman and Defendant advised Tactica to accept the Transaction that had been negotiated by Rothman and Defendant.  Defendant and Rothman failed to advise Tactica that the terms of the Transaction that they were recommending made the Transaction unconscionable and

3

exposed Tactica to the overwhelming likelihood that it would become the victim of a "pump and dump" scheme.

15.  As the proximate result of the negligent acts committed by the Defendant, the Transaction caused Tactica to suffer a decline in its share price by 99 percent, in the process losing millions of dollars in market capitalization.

16.  The Transaction also greatly increased Tactica's cost of raising capital, diluted the existing shareholders and was a contributing cause of the financial difficulties that ultimately forced Tactica to seek bankruptcy protection.

## FACTUAL BACKGROUND

### a.  The "Reverse Merger"

17.  In or about May 2005, Tactica was an established private company engaged in the sale and distribution of household and personal products. Utilizing the well-known "IGIA" name, Tactica sold its line of personal care and household products through direct marketing and through sales to various retail outlets.

18.  Pursuant to the advice of Defendant, Tactica agreed to a deal with Diva Entertainment, Inc., a shell company that had once operated as a modeling agency in South Florida. Under defendant's guidance, the entire deal was negotiated and completed within a few weeks.

### b.  Central Details of the Transaction

19. On June 11, 2004, Tactica entered into a Securities Purchase Agreement and Plan of Reorganization (the "Securities Purchase Agreement"), by and among Diva, Tactica and the Stockholders of Tactica, pursuant to which:

    a) Tactica exchanged all of its issued and outstanding; shares of common stock for shares of preferred stock and common stock of Diva as set forth below,

    b) The shareholders of Tactica would control the surviving corporation to be renamed IGIA, Inc., and

    c) Tactica would be a wholly owned subsidiary of IGIA.

20. At the close of the Transaction, and subject to certain post-closing covenants, IGIA issued the following shares to the stockholders of Tactica and certain parties designated by Tactica:

    a) 12,400,000 newly-issued shares of its common stock, and

    b) 261,000 newly-issued shares of IGIA's newly-designated Series E Redeemable Convertible Preferred Stock, which automatically convert according to the Certificate of Designation with respect thereto into 26,100,000 newly-issued shares of IGIA's common stock upon the stockholder's approval of an amendment to IGIA's Certificate of Incorporation to increase IGIA's authorized common stock from 20,000,000 to 100,000,000 shares.

21. The following events also occurred in connection with the Transaction:

    a) By action of Diva's board of directors and the holders of a majority of the Diva shareholders, Diva filed a Certificate of Amendment to its Certificate of Incorporation which changed the company's name to IGIA, Inc. and increased

the number of IGIA's authorized shares of common stock from 20,000,000 to 100,000,000 shares.

b) The Board of Directors of Diva/IGIA also authorized the filing of a Certificate of Designation with respect to a newly authorized Series E Redeemable Convertible Preferred Stock.

c) From the IGIA common shares which were outstanding pre-Transaction, after the Closing, 500,000 shares held by Fountainhead Investments remained outstanding together with approximately 70,000 shares in the "Float" which were held by public shareholders.

d) Prior to the Closing, 1,209,200 shares of IGIA's common stock were tendered by the holders thereof for cancellation.

e) Prior to the Closing of the Transaction, the IGIA Shareholders converted all of their IGIA Series A (other than as indicated below), Series B and Series C Redeemable Convertible Preferred Stock into an aggregate of 2,093,340 shares of IGIA's common stock. These shares were distributed pro-rata to the IGIA preferred shareholders. Following such conversions, the only shares of IGIA's preferred stock which remained outstanding were 100 shares of Series A Redeemable Convertible Preferred Stock which were sold by their holders to certain parties introduced by Vertical for $450,000. Post-closing, the purchasers of the remaining 100 shares of Series A Preferred stock then converted them into 4,600,000 shares of IGIA common stock. This proved to be fatal to the financial health of IGIA and doomed the Transaction to failure, and sent Tactica to bankruptcy.

22.    Prior to the Closing, Peter C. Zachariou, Diva's President and a director, and David Lean, IGIA's Acting Secretary and a director, resigned from such positions and were replaced by the board and management of Tactica, which included the following individuals and their positions subsequent to the Closing:

- Avi Sivan           Chairman, CEO  & Director
- Prem Ramchandani    President, Treasurer and Director
- Paul Greenfield     Secretary and General Counsel
- Kurt Streams        Assistant Secretary and Chief Financial Officer

23.    As a result of the Transaction, former shareholders of Tactica held approximately 76% of the outstanding voting power of IGIA. The holdings of IGIA stock at the Closing were as follows:

Common:
| | |
|---|---|
| Float | 69,800 |
| Prior Fountainhead Holdings | 500,000 |
| Conversion of Fountainhead Series | 1,150,000 |
| Other Former Preferred Shareholders | 843,340 |
| Tactica Shareholders (newly-issued) | 12,460,000 |

Preferred Shares:
Series A Preferred Shares          100
   ***Converted after the Closing to 4,600,000 shares of freely-trading common stock***

Series E Preferred Shares          261,000
   Convertible *into 26, 100,000 shares of **restricted** common stock upon approval of increase in authorized common shares to 100,000,000*

24.    Pursuant to a Stock Purchase Agreement dated June 11, 2004, the 100 shares of Series A Preferred stock were sold to Hughes Holdings, LLC, Global Asset Management, and to Gary Schonwald, all non-parties to this Complaint.  Those parties were identified and introduced by Tactica's investment banker Robert DePalo, who suggested the transaction between Tactica and Diva and introduced the parties.

7

25. The Purchasers of the 100 shares of Series A Preferred stock were closely associated with Mr. DePalo. For example, Mr. DePalo himself acquired 10,000 of the common shares resulting from the conversion of the 100 shares of Series A Preferred stock, and he signed the Stock Purchase Agreement on behalf of Hughes Holdings, LLC, which acquired 980,000 shares of the common stock following the conversion. The President and sole owner of Global Asset Management, which also acquired 980,000 shares of the common stock following the conversion, is Robert Fallah, the co-chairman of Mr. DePalo's company, Vertical Capital Partners, Inc.

26. Following the conversion to common shares, those purchasers issued the common shares to other individuals and entities that proceeded to sell the stock on the open market.

27. During the pre-transaction negotiations, Plaintiffs' officers, Ramchandani and Streams, expressed to Defendant that they feared that these Series A Preferred Purchasers, would "dump" the shares immediately following the transaction, as indeed they did.

28. However, the Defendant assured Plaintiffs' officers that in their legal opinion this could not happen.

29. Upon information and belief, Defendant based their assurance to Plaintiffs on nothing more than assurances from Mr. DePalo that he knew the purchasers, and he was confident that they would not sell the shares right away, or take any other actions to dilute the value of the IGIA stock. This proved to be a hollow promise, and not one on which defendant's legal opinion should have depended.

30. Upon the advice of Defendant, in accordance with the June 11, 2004 Stock Purchase Agreement, the new IGIA board of directors approved the conversion of the 100 Series A Preferred Shares into freely traded common stock.

### c.     IGIA's Share Price Spikes and Then Plummets

31.     On June 18, 2004, IGIA filed a form 8-K announcing the reverse merger after the close of the market.  Notwithstanding that there had been no public activity in the company's common stock previously, trade in the days immediately preceding the announcement of the merger a market suddenly developed.

32.     Thus, on June 3, 2004, the common stock (still trading as Diva) opened at $0.09 and closed at $1.01, a gain of 1,022 percent in a single day. The next day, the stock opened at $1.01 and traded as high as $2.00 intraday before falling back to close at $1.01.  On June 7, the stock opened at $2.00 and closed at $2.25. On June 17, the stock opened at $2.25 and closed at $3.00. On June 18, before the filing of the 8-K, the stock opened at $5.00 and closed at $4.25.

33.     As soon as the reverse merger closed, however, the price of the stock began to decline steadily.  Upon information and belief, the decline in price was caused by the liquidation of Class A holdings in the public markets.  By early September it had fallen some 90 percent to $0.45.

### d.     IGIA Seeks Bankruptcy Protection for Tactica.

34.     Tactica's management had been told by Mr. DePalo that a private placement would follow the reverse merger.  Therefore, Tactica's management had in good faith informed its creditors and vendors that it anticipated an immediate infusion of capital.

35.     However, when the Class A holders dumped their stock and IGIA's share price fell, IGIA's ability to secure a private placement was lost and with that Tactica lost credibility

with its creditors and vendors. This resulted in the refusal of various key vendors to continue extending trade credit.

36.     Ultimately, the principal warehouse utilized by Tactica to store and ship its merchandise refused to continue offering its services on credit terms and asserted a warehouse lien, and refused to release Tactica's merchandise. IGIA's subsidiary Tactica, ultimately filed for bankruptcy protection on October 25, 2004.

## COUNT I
## AGAINST DEFENDANT JENKENS & GILCHRIST
## FOR MALPRACTICE

37.     Plaintiffs repeat and reallege each of the allegations asserted in paragraphs 1 through 31 of the Complaint as though fully stated herein.

38.     At all times relevant herein, Rothman practiced law as a partner of Defendant J&G and had actual or apparent authority to engage in the conduct on which the negligence claim herein is based.

39.     Defendant J&G is vicariously liable for the negligent acts, errors, and omissions of Rothman in connection with legal services rendered to Plaintiffs by Rothman.

40.     As a result of the attorney-client relationship created by the above conduct, Rothman and J&G had a duty to represent Plaintiffs with the reasonable care, skill, and diligence possessed and exercised by an ordinary attorney in similar circumstances.

41.     On or about June 11, 2004, Rothman and Defendant J&G advised Plaintiffs to execute the Stock Purchase Agreement, pertaining to the 100 shares of Series A Preferred stock, which Defendant had negotiated on Plaintiffs' behalf.

42.     Defendant's conduct in advising Plaintiffs to execute the Stock Purchase Agreement was a breach of the duty to exercise reasonable care, skill, and diligence on

Plaintiffs' behalf, as it had the effect of causing to be issued a glut of 4,600,000 shares of freely-traded shares of IGIA common stock to non-affiliated shareholders who could sell the shares in the market immediately upon completion of the transaction.

43. The effect of this glut was the decline of IGIA's stock price, the loss of market capitalization, the degrading of IGIA's financial profile, which made further private investment in the companies unattainable and lead to the bankruptcy of Tactica.

44. Rothman's acts of malpractice were within the reasonable scope of the business of Defendant J&G. Defendant J&G is further responsible for advising Plaintiffs to execute the Stock Purchase Agreement, since Rothman had the actual or apparent authority to negotiate the Stock Purchase Agreement on behalf of Plaintiffs and to advise Plaintiffs as to the reasonableness, fairness and prudent of the Stock Purchase Agreement. Thus, Defendant J&G is vicariously liable for the negligence of Rothman.

45. The Stock Purchase Agreement was neither reasonable, fair nor prudent for Plaintiffs because it exposed Plaintiffs to the overwhelming likelihood that it would become the victim of a "pump and dump" scheme, which would result in the precipitous decline in IGIA's share value immediately after the merger.

46. As a result of Defendant's negligent failure to properly advise Plaintiffs regarding the Stock Purchase Agreement, Plaintiffs sustained injury and loss. Specifically, Plaintiffs' injury includes the loss of shareholder value as a result of the dumping of the Class A converted shares immediately after the Transaction.

47. As a result of the negligence of Defendant Jenkens &Gilchrist, Plaintiffs have been damaged in the sum of at least $10,000,000.00, plus interest and the cost of this suit.

**COUNT II**
**AGAINST DEFENDANT J&G**
**FOR BREACH OF CONTRACT**

48. Plaintiffs repeat and reallege each of the allegations asserted in paragraphs 1 through 39 of the Complaint as though fully stated herein.

49. Under a retainer agreement, Defendant J&G provided Plaintiffs with legal services in connection with the reverse merger transaction between Tactica and Diva.

50. Defendant J&G agreed to represent Plaintiffs for a fee and in connection with its services agreed to provide its best efforts to Plaintiffs and to provide Plaintiffs with professional services consistent with those expected of the profession at large.

51. Defendant J&G's conduct described above constitutes breach of the agreement between Plaintiffs and Defendant J&G to provide legal services. Defendant J&G's breach has caused injury to Plaintiffs, and Plaintiffs are entitled to an award of damages against Defendant J&G.

52. As a result of Defendant J&G's breach of contract, Plaintiffs sustained injury and loss. Specifically, Plaintiffs' injury includes the loss of shareholder value as a result of the dumping of the Class A converted shares immediately after the Transaction and the resulting harm to Tactica.

53. As a result the breach of contract of Defendant Jenkens &Gilchrist, Plaintiffs have been damaged in the sum of at least $10,000,000.00, plus the cost of this suit.

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

(i) On Count I, against Defendant Jenkens &Gilchrist for malpractice, a judgment with costs in the amount of at least $10,000,000;

    (ii)        On Count II, against Defendant Jenkens &Gilchrist for breach of contract, a judgment with costs in the amount of at least $10,00,000.00; and

    (iii)       Such other and further relief as the Court deems just and proper; plus appropriate interest, costs, and disbursements.

Dated: June 8, 2007
       New York, NY

                              Respectfully submitted,

                              THE MORTNER LAW OFFICE, PC

By: _____
                              Richard M. Mortner (RM-0019)
                            Attorney for Plaintiffs
                            16 East 40th Street, 12th Floor
                            New York, NY 10016
                            Tel. 212-575-0500